Filed 7/23/13  P. v. Simons CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054984 |
| v. | (Super.Ct.No. RIF10000110) |
| JUSTIN ANTHONY SIMONS et al., | O P I N I O N |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Edward D. Webster, Judge.  (Retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant Justin Anthony Simons.

Patrick E. DuNah, under appointment by the Court of Appeal, for Defendant and Appellant Tayshawn Ellis.

1

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and William M. Wood and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

## I.  INTRODUCTION

Defendant and appellant, Justin Anthony Simons, telephoned Sean McKelvey. McKelvey hung up on Simons, which Simons viewed as an act of disrespect.  Simons responded by going to McKelvey's house with two accomplices and, among other criminal acts, pistol whipped McKelvey and his housemate, stole numerous items, and threatened to kill the residents if they called the police.[1]  A jury convicted Simons of robbery, attempted robbery, assault with a firearm, making criminal threats, and negligent discharge of a firearm; it also found true certain firearm enhancement allegations.[2]  In a

---

[1]  Specifically, Simons was charged with robbery of an inhabited dwelling house in concert with others (count 1; Pen. Code, §§ 211, 212.5, subd. (a), 213, subd. (a)(1)(A)) (all further statutory references are to the Penal Code unless otherwise indicated), attempted robbery of an inhabited dwelling house in concert with others (count 2; §§ 664, 211, 212.5, subd. (a), 213, subd. (a)(1)(A)), assault with a firearm (counts 3, 4, & 5; § 245, subd. (a)(2)), criminal threats (count 6; § 422), negligent discharge of a firearm (count 7; § 246.3), and receiving stolen property (count 8, § 496, subd. (a)).  The receiving stolen property count was subsequently dismissed.  Firearm enhancements were also alleged as to counts 1, 2, and 6.  Finally, it was further alleged that Simons had been convicted of a prior serious offense (§ 667, subd. (a)) and a prior strike offense (§§ 667, subds. (c), (e)(1), 1170.12, subd. (c)(1)).

[2]  Simons's accomplices were Keyon Antwoine Ellis and defendant and appellant Tayshawn Dion Ellis.  They entered into plea agreements pursuant to which they pleaded guilty to certain charges and admitted certain enhancement allegations.  Tayshawn Ellis filed a notice of appeal.  His attorney filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436 and *Anders v. California* (1967) 386 U.S. 738, which we address in part III.E. below.

2

bifurcated trial, Simons admitted allegations that he had a prior serious offense conviction and a prior strike. He was sentenced to 26 years in prison.

On appeal, Simons contends: (1) the court erred by allowing the prosecution to introduce, under Evidence Code section 1101, subdivision (b), evidence of a prior burglary; (2) the evidence is insufficient to support the conviction of negligent discharge of a firearm; (3) the court erred in failing to stay, under Penal Code section 654, the punishment for the crime of negligent discharge of a gun; and (4) the court erred in refusing to dismiss the strike prior allegation. We agree that the court erred by allowing evidence of the prior burglary, but hold such error was harmless. We reject Simons's other arguments and affirm the convictions.

## II. SUMMARY OF FACTS

Sean McKelvey and Lucas Pothakos lived in a mobilehome with Pothakos's three-year-old son. The home was in a semi-rural area of Romoland in Riverside County. McKelvey worked at a convenience store where Simons was a regular customer. He described Simons as an "acquaintance."

On the evening of January 9, 2010, McKelvey and Pothakos were at a party when Simons called McKelvey on his cell phone. Simons told McKelvey he wanted to get together and "smoke some weed" or "smoke a bowl." McKelvey told him he would, but they did not make a definite plan.

When Simons made further calls to McKelvey that night, McKelvey ignored them. However, he unintentionally answered one of the calls when his phone was in his pocket.

3

When McKelvey realized this, he hung up on the call. Simons responded by sending McKelvey a text message that said: "You fucked up."

McKelvey and Pothakos returned home from the party sometime between 1:30 a.m. and 2:00 a.m. Shortly afterward, Simons and two other men arrived at the mobilehome. When Simons gave Pothakos his name, Pothakos opened the door. Simons said something about how he had been "disrespected" because McKelvey did not answer his calls and had hung up on him.

One of Simons's accomplices hit Pothakos in the face repeatedly with the butt of a gun and forced him to the ground. The other accomplice entered the home and hit McKelvey in the back of the head with a gun, knocking him to the floor. Pothakos and McKelvey were told to stay on the ground.

Simons appeared to be the leader and began "[b]arking orders" to his accomplices. He told them to "grab the laptop" that was on a coffee table. The intruders yelled at Pothakos and McKelvey to tell them where guns, money, and valuables were located. While one accomplice stood watch over Pothakos and McKelvey, Simons and the other man ransacked the trailer looking for valuables.

Each time Pothakos started to speak or make a noise, he was struck in the face. One of the men told Pothakos that if he did not stop crying he would shove a pool cue "up [his] ass."

Someone brought Pothakos's son out of a bedroom and put him on the floor between Pothakos and McKelvey. One of the men pointed a gun at the child, cocked it,

4

and told Pothakos to give them what he had. Pothakos repeatedly told them he did not have anything to give them. Eventually, he told them he had marijuana in the bottom two drawers of the refrigerator. One of the men took the marijuana from the refrigerator. They also took Pothakos's wallet, Blackberry cell phone, car keys, cigarette lighter, a watch, and his grandfather's diamond and gold pinky ring.

As the three men began to leave, Simons told Pothakos and McKelvey: "You fucked up. I don't want to be disrespected. This is what happens. And if the cops come to my house, I'm going to come back here and I'm going to kill you and I'm going to kill your kid."

After the three men left the house, Pothakos ran outside. He saw a silver Chevrolet truck speeding away. When it was about 50 feet away, Pothakos heard a gunshot and dropped to the ground. A neighbor, who was awakened by the sound of tires spinning on the gravel driveway, also heard a gunshot.

### III.  DISCUSSION

A. *The Admission of Evidence of Simons's Prior Burglary Was Harmless Error*

Prior to trial, the prosecution indicated it intended to offer evidence under Evidence Code section 1101, subdivision (b), of a prior burglary Simons committed. The prosecution argued that the evidence was relevant to Simons's intent to steal. More specifically, the prosecution intended to offer the evidence of the prior burglary to contradict the anticipated defense theory that Simons went to Pothakos and McKelvey's residence to buy marijuana, but his companions committed robbery.

5

At the outset of an Evidence Code section 402 hearing on the matter, the court stated: "Under normal circumstances, the fact that a person does a dissimilar burglary to this would not be relevant. But if [the prosecutor] is correct that the defense is going to be that the defendant went to the victim's residence to buy marijuana and unbeknownst to him the co-defendants did the robbery, then I could see that the prior . . . incident would be relevant." Following argument, the court ruled that it would permit the evidence of the prior burglary based on the understanding that the defense's theory was that Simons "just went [to Pothakos and McKelvey's residence] to buy weed, and then these two guys went crazy. If we did not have that statement or that was not the basis for the defense, I would not let in [Evidence Code section] 1101[, subdivision] (b) evidence."

At trial, a detective testified that Simons admitted committing the burglary in November 2008. Simons told the detective he kicked in a back door to the residence and "took a bucket with change and some paperwork, including blueprints and a welder's certificate[,] and a laptop computer." Simons said he sold the laptop to an acquaintance. On cross-examination, the detective stated that no one was inside the house during the burglary (other than Simons) and that it took place in the middle of the day.

In her closing argument, defense counsel argued that Simons went to the mobilehome "to smoke marijuana," "to sit around and get high." His associates, however, "turned it into a robbery."

Simons contends the court abused its discretion in allowing the testimony regarding the 2008 burglary and deprived him of his constitutional rights to due process

6

and a fair trial. We review the trial court's ruling for an abuse of discretion. (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.)

Evidence Code section 1101, subdivision (b), permits the admission of evidence that a person committed a crime "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." As with other circumstantial evidence, the admissibility of evidence of uncharged crimes "depends on the materiality of the fact sought to be proved, the tendency of the prior crime to prove the material fact, and the existence or absence of some other rule requiring exclusion. [Citation.]" (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 203.)

Here, the prosecution offered the evidence of the 2008 burglary to prove the element of intent for the crimes of robbery and attempted robbery, i.e., the intent to permanently deprive Pothakos and McKelvey of their property. (See *People v. Mumm* (2002) 98 Cal.App.4th 812, 817.) More specifically, the prosecution sought to contradict the defense theory that Simons lacked the requisite intent because he intended only to buy marijuana from McKelvey when his associates robbed or attempted to rob the occupants.

When evidence of uncharged acts is offered to prove the defendant's intent, "the uncharged misconduct must be sufficiently similar to support the inference that the defendant '"probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.) "For example, in a prosecution for shoplifting in which it was conceded or assumed that the defendant left

7

the store without paying for certain merchandise, the defendant's uncharged similar acts of theft might be admitted to demonstrate that he or she did not inadvertently neglect to pay for the merchandise, but rather harbored the intent to steal it." (*Id.* at p. 394, fn. 2.) An analogous example for our purposes would be evidence of a prior instance in which Simons went to an acquaintance's home ostensibly to buy marijuana, was let into the house, and he or his companions then proceeded to steal from the residents. The similarity of such events would support an inference that Simons (as well as his companions) harbored the intent to steal in both instances.

The 2008 burglary shares no such similarity to the present case. In the prior instance, Simons entered a residence by kicking in a back door of the residence during the middle of the day, without the aid of accomplices, when no one was home. In our case, Simons arrived at Pothakos and McKelvey's mobilehome in the middle of the night with two associates when the residents were home and awake; he knocked on the front door, gave his name, and entered after the door was opened. Other than the fact that both instances took place in a residence and involved the theft of a laptop computer, the two instances share nothing in common. Indeed, the dissimilarities are striking. The fact that he broke into a vacant home through a back door during the daytime suggests a modus operandi contrary to his conduct in the present case in which he knocked at the front door and waited to be let in. The facts not only fail to suggest an inference of a similar intent, but suggest a contrary intent. The fact that Simons's defense was that his intent was

8

merely to purchase marijuana arguably makes the element of intent more material, but it does not make the prior act any more relevant.

Although taking a laptop computer from a home without the owner's permission in each instance suggests the intent to steal it on both occasions, that intent is clear from Simons's direction to "grab the laptop" in the present case; the prior instance adds nothing toward proving such intent.

Because the evidence of the 2008 burglary does not logically or reasonably support an inference that Simons harbored the intent to steal in the present case, the court erred in allowing the testimony regarding the prior incident into evidence.

Simons contends that the evidence of the 2008 burglary violated his constitutional rights to due process. We disagree. The admission of evidence violates the due process clause only when it "'is so extremely unfair that its admission violates fundamental conceptions of justice,' [citation] . . . ." (*Perry v. New Hampshire* (2012) ___ U.S. ___ [132 S.Ct. 716, 718]; accord, *People v. Fuiava* (2012) 53 Cal.4th 622, 696.) No such unfairness occurred here. The testimony regarding the 2008 burglary was brief—taking up approximately two pages of the reporter's transcript—and not inflammatory when compared to the charged crime. It did not, as Simons asserts, serve to paint him as a person with a propensity for violent behavior. Simons was not deprived of due process or a fair trial.

Absent fundamental fairness, state law error in admitting evidence is subject to the traditional *Watson*[3] test: "The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439.) Here, the evidence of Simons's guilt is overwhelming. After McKelvey hung up on Simons, Simons texted McKelvey to tell him he "fucked up." Simons showed up at McKelvey's home shortly afterward with two gun-carrying associates and complained that he had been disrespected. Simons appeared to be the leader, barking orders to the others, including the direction to take the laptop computer. His associates beat Pothakos and McKelvey with guns and, while one held them to the ground, Simons and an accomplice ransacked the home looking for valuables. As he left, Simons explained that "[t]his is what happens" when he is "disrespected," and threatened to kill Pothakos and his child if the police were called. There was, in short, no evidence to support Simons's argument that he went to the mobilehome merely to buy or smoke marijuana. Based on our review of the entire record, it is not reasonably probable that the verdict would have been more favorable to Simons if the evidence of the 2008 burglary was excluded. The error was therefore harmless.[4]

---

[3] *People v. Watson* (1956) 46 Cal.2d 818.

[4] Even if the error deprived Simons of any federal constitutional right, the error was also harmless beyond a reasonable doubt under the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18, 24.

10

B. *There Was Sufficient Evidence to Support the Conviction for Negligent Discharge of a Firearm.*

Simons contends the evidence is insufficient to support the conviction on count 7 for negligent discharge of a firearm under section 246.3. We disagree.

In reviewing a claim that a conviction is not supported by sufficient evidence, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

Former section 246.3, subdivision (a), provides: "Except as otherwise authorized by law, any person who willfully discharges a firearm in a grossly negligent manner which could result in injury or death to a person is guilty of a public offense and shall be punished by imprisonment in a county jail not exceeding one year, or by imprisonment in the state prison." The elements of negligent discharge of a firearm under section 246.3, subdivision (a), are: "'(1) the defendant unlawfully discharged a firearm; (2) the defendant did so intentionally; (3) the defendant did so in a grossly negligent manner which could result in the injury or death of a person.' [Citation.]" (*People v. Ramirez* (2009) 45 Cal.4th 980, 986.)

Simons does not appear to challenge the first two elements. The issue, therefore, is whether there is sufficient evidence to support the jury's finding that Simons

11

discharged a firearm in a grossly negligent manner that could result in the injury or death of another.[5] Gross negligence in this context "'requires a showing that the defendant's act was "'such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences.'" [Citations.]'" (*People v. Ramirez, supra,* 45 Cal.4th at p. 989.)

Initially, we note that the parties disagree as to whether Pothakos saw a gun being fired or merely heard the gunshot. Simons asserts that "there was no testimony as to the direction of the shooting" and "Pothakos did not see" the shot. He adds that "no one can testify as to the direction of the barrel. The bottom line is that no one saw anything with regards to the gun short of hearing the sound of it." Based on this, he argues: "Because [the gun] could have been pointing directly into the ground from a short distance, or into some other substance that would have wholly absorbed the bullet, or even towards a portion of the area where no one lived, there is no evidence demonstrating that [Simons] either personally or aided and abetted a discharge of that gun 'in a grossly negligent manner which could result in injury or death to a person.'" The Attorney General's argument, on the other hand, appears to assume that Pothakos saw the gunshot, but was

---

[5] Simons does not appear to argue that there is insufficient evidence to establish that he acted as either a perpetrator or an aider and abettor if there is, in fact, substantial evidence that one of the three participants discharged a firearm in the manner required under the statute.

12

not sure if the shot was "in the air or in [Pothakos's] general direction." To resolve this conflict, we examine Pothakos's testimony on the matter.

On direct examination, Pothakos testified that he ran outside and saw the truck going down the driveway at a high rate of speed. He then stated that "by the time I got to the bottom of my steps . . . , that's when I heard the gunshot, and I hit the ground." Upon further questioning, he reiterated that he saw the truck "barreling down my driveway. And as soon as I hit—heard the shot, I hit the ground." Later, Pothakos stated for the third time, "when I heard the gunshot, I hit the ground." On cross-examination, defense counsel elicited from Pothakos that he had told a deputy sheriff that the shot was fired "in the air." The following colloquy occurred.

"[Q.] You said at the end, after they—guys had left the residence, that someone fired in the air.

"A. I don't know if—I don't know if it was in the air or if it was in my general direction, but a shot was made.

"Q. Well, when you talked to Deputy Rooker, you told him that it was fired in the air. Right?

"A. I heard a gunshot.

"Q. Okay. But when you talked to Deputy Rooker, you told him specifically that it was fired in the air. Right?

"A. I—I guess. Maybe. I don't know if it was—I honestly don't know if it was shot in the air or if it was shot at me. I just know it happened.

13

"Q. Okay. But what I'm asking you about is what you told Deputy Rooker. Isn't it true that when you talked to him, you specifically said that it was fired in the air?

"A. I guess so. Yes."

Based on this testimony, we agree with Simons's interpretation—Pothakos heard a gunshot, but did not see the direction in which the gun was fired. Although he was never specifically asked by either attorney whether he saw or heard the gunshot, he testified about the gunshot on direct examination only in terms of *hearing* the shot; if he had also seen the gunshot, it would have been natural and appropriate to say so. When pressed on cross-examination about his prior statement to the deputy sheriff that the shot was fired in the air, he responded that he "heard a gunshot." The response suggests he was trying to dispel the suggestion that he *saw* the direction of the gunshot. His statements that he did not know if the shot was aimed in the air or at him further indicate that he did not see the direction of the gunshot. Reading the testimony in its entirety, we conclude that the testimony is evidence that Pothakos heard a gunshot, but did not see the direction of the shot.

Although we agree with Simons that there is no evidence that anyone saw the direction of the gun as it was fired, we do not believe such evidence is required to prove a violation of section 246.3. *People v. Overman* (2005) 126 Cal.App.4th 1344 [Fourth Dist., Div. 2] and *People v. Thomas* (2011) 52 Cal.4th 336 are instructive.

In *Overman*, the defendant was charged and convicted of discharging a firearm at an occupied building under section 246. (*People v. Overman, supra,* 126 Cal.App.4th at

14

p. 1350.) The jury was not instructed as to the lesser offense of negligent discharge of a firearm under section 246.3. (*People v. Overman, supra,* at p. 1358.) On appeal, we held that the court should have instructed the jury as to the lesser offense because there was substantial evidence that the lesser, but not the greater, offense was committed. (*Id.* at p. 1363.) In particular, there was evidence that the defendant fired a rifle in the general vicinity of several persons; although there were witnesses who saw the defendant with the rifle shortly before it was fired, *no one saw where the defendant was pointing the rifle at the time he fired it*; no bullet holes or points of impact were found on any buildings or objects in the area; and other evidence indicated that the defendant fired away from the occupied office building. (*Id.* at pp. 1352, 1362-1363.)

In *Thomas*, the defendant's girlfriend told the defendant that Russell had forced his way into her apartment, ransacked it, and choked her. (*People v. Thomas, supra,* 52 Cal.4th at pp. 341, 347.) The defendant responded by telling his girlfriend: "'This is it. I'm tired of him. . . . I'm going over there.'" (*Id.* at pp. 346-347.) The defendant and another person then went to Russell's house. When he arrived, DeMarco Atkins told the defendant through a window that Russell was not there. (*Id.* at p. 347.) Atkins heard a gun being cocked. The defendant said he was looking for Russell and was "'going to get him.'" (*Ibid.*) Atkins then heard two people running around to the front of the apartment. Minutes later, he heard shots, but did not see who was shooting. Although cartridge casings were found near Russell's home, no bullets hit the apartment. (*Id.* at pp. 347, 362.) The Supreme Court held that the evidence was sufficient to satisfy the

15

requirement under section 246.3 that shots were fired in a grossly negligent manner which could result in death or injury to a person. (*People v. Thomas, supra,* at pp. 363-364.)

In *Overman* and *Thomas*, the courts found substantial evidence to support the gross negligence element of section 246.3 even though no one saw the shots as they were fired and there was no evidence as to the direction of the shots. The absence of such evidence, therefore, does not necessarily prevent a jury from concluding that the shot Pothakos heard was fired in a grossly negligent manner that could result in death or injury to a person.

Simons also asserts that "there is . . . no evidence as to the density of the area where the shot occurred." Although an impetus for the enactment of section 246.3 was the practice of "celebratory gunfire in an urban setting" (*People v. Ramirez, supra,* 45 Cal.4th at p. 990), there is no requirement that the shooting take place in an area of high density or "that a given person was actually . . . endangered." (*Ibid.*) The question is whether "it was reasonably foreseeable that human injury or death might result under the circumstances[.]" (*Ibid.*) Here, the gunshot was heard by Pothakos after he went outside his home and saw defendant's truck driving away. Because the truck was within his line of sight, he was presumably unprotected from an errant bullet. McKelvey, Pothakos's son, and at least one neighbor were not far away and also at some risk of being hit. When these facts are considered, along with the fact that Simons or his accomplices had just minutes earlier shown their willingness to commit violence by pistol-whipping Pothakos

16

and McKelvey and threatening to kill them if they called police, a jury could conclude that it was reasonably foreseeable that human injury or death might result from the shooting.

C. *The Court Did Not Err in Refusing to Stay, Under Section 654, the Punishment for Negligent Discharge of a Firearm*

The trial court imposed a three-year sentence for the conviction on count 7 for negligent discharge of a firearm. The sentence was to run concurrent to the convictions on the robbery, attempted robbery, and assault counts. Simons contends the court should have stayed that sentence under section 654. Because the court's failure to stay the sentence was not an abuse of discretion, we find no error.

Section 654, subdivision (a), provides, in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The statute precludes multiple punishment when a single act or an indivisible course of conduct violates two or more criminal statutes. (*People v. Hester* (2000) 22 Cal.4th 290, 294; *People v. Deloza* (1998) 18 Cal.4th 585, 591.)

Whether multiple crimes were committed as part of an indivisible course of conduct depends upon the defendant's intent and objective. (*People v. Harrison* (1989) 48 Cal.3d 321, 335; *In re Adams* (1975) 14 Cal.3d 629, 634.) "'If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but

17

not for more than one.' [Citation.]" (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.)

"On the other hand, if the evidence discloses that a defendant entertained 'multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citations.]" (*In re Adams, supra,* at p. 634.)

The defendant's intent and objective are factual questions for the trial court. (*People v. Coleman* (1989) 48 Cal.3d 112, 162.) The court's finding, whether express or implied, will be upheld on appeal if supported by substantial evidence. (*People v. Osband* (1996) 13 Cal.4th 622, 730-731; *People v. Powell* (2011) 194 Cal.App.4th 1268, 1296.) We review the trial court's determination in the light most favorable to the defendant, and we presume the existence of every fact the trial court could have reasonably deduced from the evidence. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

By failing to stay the sentence on count 7, the trial court implicitly found that when the shot was fired, Simons harbored an intent and objective distinct from the intent and objective of the robbery. There is no dispute that there is substantial evidence to support an implied finding that Simons, while inside the mobilehome, had the intent and objective to steal from the residents. The question is whether there is substantial evidence of a distinct intent and objective for the subsequent shooting.

18

*People v. Johnson* (1969) 270 Cal.App.2d 204 is instructive. In that case, the defendant and an accomplice walked into a service station and robbed two individuals at gunpoint. (*Id.* at p. 206.) As they sped away in a car, the driver of the car fired a shot toward one of the robbery victims. (*Ibid.*) The defendant (who was in the passenger seat of the getaway car) was convicted of armed robbery and, based on the firing of the gun, assault with a deadly weapon. (*Id.* at p. 208.) He was punished for each count. On appeal, the defendant argued that the sentence of one count should have been stayed pursuant to section 654. (*People v. Johnson, supra,* at p. 208.) The Court of Appeal rejected the argument, stating: "The evidence reflects that appellant and his partner robbed the two service station attendants. When the robberies were completed, they drove away from the station and as the car left a shot was fired from the car. Whether this act was divisible from the robberies was a question of fact decided by the trial court, and was properly determined under the authorities. [Citations.] The shot fired at [the robbery victim] was not a means of perpetrating the robbery, since that already had been accomplished. '. . . when the assault is not a means of perpetrating the robbery but is an act that follows after the robbery is completed the defendant is guilty of two punishable acts.' [Citation.] Accordingly, he did not receive the double punishment prohibited by Penal Code section 654." (*Id.* at pp. 208-209.)

Here, at the time of the shooting, Simons and his accomplices were in a truck 50 feet from Pothakos and speeding away. It was not possible for Pothakos, who was on foot, to catch them. As the Attorney General points out, for the robbers to "escape, they

19

could have simply continued to drive away." Like the trial court in *Johnson*, the court in this case could have reasonably concluded that the shot fired from the getaway vehicle was not a means of perpetrating the robbery because that already had been accomplished. Instead, the shot appeared to be fired for some other purpose, such as frightening Pothakos or to add weight to the threat to kill the victims if the police were called. Because the court's implied findings are supported by substantial evidence, it did not abuse its discretion in failing to stay the sentence on count 7.

D. *The Court Did Not Err in Denying Simons's Romero[6] Motion*

In a bifurcated trial, Simons admitted allegations that he had a prior serious offense conviction and a prior strike. Thereafter, Simons filed a so-called *Romero* motion in which he invited the trial court to exercise its discretion to strike the prior strike allegation. In support of the motion, Simons pointed to, among other matters, his cooperation with the police in the investigation of this case and his confession of other burglaries. He also asserted that the residential burglary that was the subject of the prior offense "arose from the same underlying issue in the present case, a drug addiction which continues to haunt [Simons] and influence his actions in negative ways." His efforts to financially support his mother and help raise two younger brothers, his work toward getting a general equivalency degree (GED), and having to drop out of school to support his girlfriend and son, are also cited.

---

[6] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

20

In denying the *Romero* motion, the court gave the following reasons: "The defendant has a conviction for first degree burglary in 2007. That is a recent conviction. He also has pending four additional residential burglaries, plus this crime. In my view, it would be an abuse of discretion to strike the prior conviction. Under [*People v. Williams* (1998) 17 Cal.4th 148], I would have to find that he falls outside the spirit of the three strikes law, and so I really can't find that to be the case. [¶] Also, this isn't the situation where we're dealing with a third strike and facing a 25-year-to-life sentence, so there are lots of reasons why the strike . . . should remain, and I would deny the motion under *Romero*."

On appeal, Simons argues that the court's ruling was an abuse of discretion. We disagree.

The "Three Strikes initiative, as well as the legislative act embodying its terms, was intended to restrict courts' discretion in sentencing repeat offenders." (*People v. Superior Court (Romero), supra,* 13 Cal.4th at p. 528.) The trial court's discretion to strike a qualifying strike is therefore guided by "established stringent standards" designed to preserve the legislative intent behind the Three Strikes law. (*People v. Carmony* (2004) 33 Cal.4th 367, 377.) "[T]he court . . . must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence

21

should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

A court's refusal to dismiss a prior strike conviction is reviewed for an abuse of discretion. (*People v. Carmony, supra,* 33 Cal.4th at p. 374.) The court will abuse its discretion only if its refusal to dismiss the prior strike "is so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at p. 377.) However, a reviewing court will find an abuse of discretion when the factual findings critical to the trial court's decision have no support in the evidence. (*People v. Cluff* (2001) 87 Cal.App.4th 991, 998.) The defendant has the burden of demonstrating that the court's decision was irrational or arbitrary. (*People v. Carmony, supra,* at p. 376.)

Simons refers us to his youth (he was 22 when he was sentenced), the fact that no one was home when he committed his prior burglary, his lack of personal use of a gun in the present case, his cooperation with the police, his addiction to drugs and alcohol, his childhood charitable work, his work towards getting his GED, and the fact that he will be sentenced to 18 years in prison even without the prior strike.

The trial court did not abuse its discretion in denying Simons's *Romero* motion. The violent crimes against Pothakos and McKelvey were provoked when McKelvey inadvertently answered a phone call, then hung up on Simons. Although he did not personally use a gun, he was the leader of the attack, directing his accomplices and ransacking the home. As he left, he threatened to kill the victims and Pothakos's three-year-old son if they called the police.

22

The burglary that was the basis of the prior strike conviction occurred in December 2008.[7]  In that case, Simons broke into and ransacked a home, stealing property, including a shotgun, valued at $106,149.  After entry into a plea agreement, he was sentenced to a term of 180 days.  The crimes committed against Pothakos and McKelvey occurred approximately 13 months after that burglary and approximately six months after he served his sentence.  In addition to the prior conviction, Simons confessed to other burglaries in 2008, three of which are the subject of a separate criminal proceeding.  Simons told his girlfriend that during one of these burglaries he snapped the neck of a barking dog, killing it.  The short length of time between the prior strike and the present crimes, as well as the commission of other crimes, is ample evidence of the recidivism that the Three Strikes law is intended to address.  These facts support the court's exercise of discretion in denying Simons's *Romero* motion.  Accordingly, there was no error.

E. *Tayshawn Ellis Appeal*

As noted above, Tayshawn Ellis pled guilty to robbery (count 1), attempted robbery (count 2), and assault by force likely to produce great bodily injury (count 5), and admitted a firearm enhancement as to count 1.  He did so with the understanding that he would be sentenced to prison for 17 years.  He acknowledged in writing and orally in court that he had been advised of and waived his rights:  to a speedy and public trial; to

---

[7]  The burglary alleged as the prior strike is not the same burglary that was the subject of the Evidence Code section 1101, subdivision (b) issue.

23

confront and cross-examine witnesses; to subpoena witnesses for trial; to avoid self-incrimination and not testify; and to be provided with and represented by counsel.  He also expressly waived his right to appeal.  The court found that Ellis made these waivers knowingly and intelligently.  Ellis further acknowledged the specific consequences of his plea.

In connection with his plea, the parties stipulated that the court could make factual findings based upon the statement of facts set forth in the prosecution's trial memorandum.  The statement of facts is substantially similar to our statement of facts set forth above, but identifies Ellis as one of Simons's accomplices and adds that items stolen from Pothakos were found at Ellis's residence and on his person at the time of his arrest.  The court found that his pleas and admissions were made freely and voluntarily, and that there was a factual basis for the plea.

Ellis's 17-year sentence was based on:  the middle term of six years on count 1, 10 years for the gun enhancement, a concurrent term of three years for count 2, and a consecutive term of one year (one-third the middle term) for count 5.

Ellis filed a notice of appeal accompanied by a request for a certificate of probable cause, which the trial court denied.

After Ellis appealed, and upon his request, this court appointed counsel to represent him on appeal.  Counsel has filed a brief under the authority of *People v. Wende, supra,* 25 Cal.3d 436 and *Anders v. California, supra,* 386 U.S. 738, setting forth

a statement of the case, a summary of the facts and potential arguable issues, and requesting that this court undertake a review of the entire record.

We offered Ellis an opportunity to file a personal supplemental brief, but he has not done so. Pursuant to the mandate of *People v. Kelly* (2006) 40 Cal.4th 106, we have conducted an independent review of the record and find no arguable issues.

The potential issues identified in Ellis's appellate counsel's brief are: (1) was Ellis properly advised of his constitutional rights and of the consequences of pleading guilty, and did he properly waive his constitutional rights before pleading guilty?; (2) is Ellis's guilty plea constitutionally valid?; and (3) did the court abuse its discretion in sentencing Ellis?

Based on our review of the record, we conclude:

1. Ellis was fully and fairly advised of his rights and of the consequences of pleading guilty, and the court found he knowingly and intelligently waived his rights prior to pleading guilty. (See *Boykin v. Alabama* (1969) 395 U.S. 238, 243-244; *In re Tahl* (1969) 1 Cal.3d 122, 130-132.)

2. Ellis's plea is constitutionally valid. (See *Boykin v. Alabama, supra,* 395 U.S. at pp. 243-244; *In re Tahl, supra,* 1 Cal.3d at pp. 130-132; *People v. Panizzon* (1996) 13 Cal.4th 68, 79-84.)

3. The sentence was in accord with the plea agreement and the court did not abuse its discretion in pronouncing the agreed-upon sentence. (See *People v. Segura* (2008) 44 Cal.4th 921, 930-931.)

Accordingly, we will affirm the judgment as to Ellis.

## IV.  DISPOSITION

The judgments are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
J.

We concur:

RAMIREZ
P. J.

MILLER
J.